Leoanrd S. Spinelli, Esq.
Charles J. Messina, Esq.
**GENOVA BURNS, LLC**
494 Broad Street
Newark, NJ 07102
Ph: (973) 230-2085
Fax: (533-1112
lspinelli@genovaburns.com

**UNITED STATES BANKRUTPCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA – LOS ANGELES DIVISION**

| | |
|---|---|
| Cassaforte Ltd.<br><br>Plaintiff,<br><br>v.<br><br>Jhonalyn Jhoiey Ramirez<br><br>Debtor/Defendant. | Case No.: 2:21-bk-184732-NB<br><br>Chapter 13<br><br>Adv. Pro. No.: _____ |
| **COMPLAINT TO DETERMINE DISCHARGABILITY OF DEBT PURSUANT TO 11 U.S.C. § 523(a)(2)(A)** ||

Plaintiff, Cassaforte, Ltd. ("Cassaforte") brings this adversary proceeding pursuant to 11 U.S.C. § 523(a)(2)(A) seeking an order determining that the debt owed to Cassaforte by Debtor Johnalyn Jhoiey Ramirez ("Debtor" or "Ramirez") is excepted from discharge, on the grounds that the debt was obtain by fraud, false pretenses and/or false representations. As and for its Complaint against Debtor, Cassaforte states the following:

**JURISDICTION AND VENUE**

1. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334, and 11 U.S.C. § 523. This Adversary Proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I).

1

2. Venue in the Central District of California is proper under 28 U.S.C. § 1409(a).

3. This Adversary Proceeding relates to *In re Jhonalyn Jhoeiy Ramirez*, No. 2:21-bk-184732-NB (Bankr. C.D. Cal.) now pending in this Court (the "Bankruptcy Case").

4. Plaintiff holds general unsecured claims against the Debtor, which are the subject of the action pending in the Superior Court of the State of California, County of Los Angeles, Central District, captioned *Cassaforte Limited v. Jhonalyn Jhoiey Ramirez, et al.*, Case No. 20-STCV-09319 (the "State Action"). A true and correct copy of the Complaint in the State Action is attached hereto as **Exhibit A**.

5. In addition to the claims alleged in the State Action Complaint, during the course of discovery Cassaforte discovered facts giving rise to additional claims of fraudulent misrepresentation and fraudulent inducement on the part of Ramirez, as more fully described herein.

6. Presently, Cassaforte's Motion to Lift the Automatic Stay is pending the Bankruptcy Case (Dkt No. 31), and is returnable on February 15, 2022. Upon obtaining relief from the automatic stay, subject to this Court's approval, Cassaforte intends to seek leave in the State Action to interpose the claims related to the Debtor's fraudulent conduct.

## THE PARTIES

7. Cassaforte is a Cypriot limited company organized and existing under the laws of the Republic of Cyprus, with its principal place of business located at 1st Floor, Eurosure Tower, 5 Limassol Avenue, 2212 Nicosia, Republic of Cyprus. Cassaforte is a mezzanine lender specializing in real estate investments that involve the significant rehabilitation of single-family residences in New York City and Los Angeles.

8. Ramirez is, and all times referenced herein, was an individual and a citizen of the State of California. Ramirez conducts business in the County of Los Angeles and holds herself out as "designer and visual artist specializing in interiors and architecture." She also expressly claims that her "background in architecture has been a monumental service to both her and her clients – holding a BS in Architecture and Masters in Interior Architecture has allowed great versatility and skill as the industry of interior design and architecture are inherently intertwined."

9. Ramirez is not a licensed California architect.

## STATEMENT OF FACTS

**Cassaforte's Development of 1523 3/8 North Doheny Drive**

10. On or about July 2017, Aaron Johnson ("Johnson") and his wholly-owned entity XYZ Group LLC ("XYZ Group") approached Cassaforte with a proposal to participate in several property acquisitions and development projects by providing loans to special purpose entities to be established by XYZ Group for the purposes of funding each development project. The debt was to be secured by a mortgage over the subject property of each project. Thereafter, it was decided that these projects would include the acquisition, development, and sale of the real property located at 1523 3/8 North Doheny Drive, Los Angeles, California 90069 (the "Property").

11. Several potential lenders ("Senior Lenders") to these development projects declined to participate in the projects by way of this proposed structure because: (i) they would not agree to a fee-owning entity granting any security over the subject properties to any other party, whether such security was subordinated to the Senior Lender's security or not; and (ii) Cassaforte's status as a foreign lender would result in lengthy and expensive due diligence requirements for Senior Lenders, which they were not willing to undertake.

12. XYZ Group subsequently requested, and Cassaforte agreed, that the proposed structure be replaced with a new structure ("New Structure") whereby XYZ Group would establish special purpose entities, *i.e.,* XYZ Holdings LLC and XYZ Holdings LA LLC, to hold all of the membership interests in the fee-owning companies and two other special purpose entities, *i.e.,* XYZ Partners and XYZ Partners LA, to hold 90% of the membership interests in XYZ Holdings and XYZ Holdings LA respectively.

13. Under the mezzanine loan agreements, Cassaforte agreed to advance loans to XYZ Partners to fund the purchase of membership interests in XYZ Holdings which, in turn, would fund XYZ Holdings' purchase of membership interests in the fee-owning companies. In exchange, and in order to secure the punctual performance of XYZ Partners and XYZ Holdings' obligations under the various loan agreements, Cassaforte was granted a security interest in all of the membership interests in XYZ Partners and XYZ Holdings, and over all of the membership interests held by Johnson in XYZ Partners.

14. Between July 2017 and March 2018, Cassaforte and XYZ Group entered four transactions in which Cassaforte funded the development of four New York City properties pursuant to this structure. Cassaforte and XYZ Group similarly adhered to this New Structure when they created the transaction documents that pertain to the Property. Accordingly, XYZ Partners LA LLC, XYZ Holdings LA LLC, and the fee-owning company of the real property, 1523 Doheny, LLC, ("Doheny Owner Company") were formed on or about June 2018.

15. Doheny Owner Company is a single purpose limited liability company that owned fee title to the Property, until the Property was foreclosed upon. (Doheny Owner Company's efforts to acquire, develop, and sell real property will be referred to as the "Project.") Doheny Owner Company is governed by transaction documents that include Loan Agreements and Operating

Agreements. These transaction documents are substantively identical to those that Johnson and Cassaforte had employed for other, earlier real estate development projects.

16. Johnson, through XYZ Group, was to act as Operating Manager and, inter alia, manage and control the day-to-day business and affairs of the Doheny Owner Company, and conduct all Owner business in accordance with the first-class standard of care required of prudent and experienced third- party managers, and in accordance with Doheny Owner Company's Project Budget and Project Business Plan.

17. The Property was purchased for approximately $2.26 million in or around June 2018 using the pooled investment funds from Cassaforte and XYZ Group, as well as a commercial loan from a lender (the "Lender") secured by a Deed of Trust. XYZ Group contributed approximately $50,000 toward the acquisition.

18. As of the date the State Action was filed, Cassaforte had contributed approximately $848,000 to the Project.

19. Thus, although Johnson exercised a managerial position over Doheny Owner Company, Cassaforte provided all the funds for the Project, outside of those provided by the lender. Cassaforte also made sure that it possessed substantial approval rights over the Project-as detailed in the transaction documents-as a means of ensuring its investment was protected.

20. Cassaforte supplied XYZ Group with the necessary Project funds through various means-via bank wire or otherwise and these funds were deposited in Doheny Owner Company's account. These funds were earmarked for developing the Project.

**Debtor's Falsely Represented Herself to Cassaforte's Agents as an Architect**

21. In or about March 2018, during the time that Cassaforte was contemplating financing the purchase of the Property, Johnson introduced Ramirez to Josh Lewski ("Lewski"), an agent of Cassaforte, whom Ramirez knew to be an investor in the Property.

22. At the time, Ramirez knew that a third-party lender (i.e. Cassaforte) was contemplating making a mezzanine loan to the Project and that without a mezzanine loan, the Project with her as architect would not proceed.

23. Lewski not only corresponded with Ramirez but also personally met with her in Los Angeles prior to agreeing to her engagement as the Project architect.

24. Indeed, Cassaforte insisted upon vetting any architect or other professional before they could be engaged on the Project. This is because, as detailed above, XYZ Group acted only as the operating manager for the Doheny Owner Company. XYZ Group's responsibilities included managing the day-to-day issues of the Project, and dealing with the design, construction and other professionals, but it was not allowed to proceed with any Major Decision, including the hiring of professionals, without the express consent and approval of Cassaforte.

25. Ramirez represented she was an experienced local architect, and that she and Studio Jhoiey (the consulting company in which Debtor was the sole-member) were interested in-and capable of-designing and developing the Property.

26. Ramirez represented herself as an expert in design and architecture and Ramirez took Lewski to several properties which she represented as her projects, both completed and works in progress, to demonstrate her competency and capability.

27. At the time, Ramirez knew that she was not a licensed architect and that it is "unlawful for any person to use a business name that includes as part of its title or description of services the term "architect," "architecture," or "architectural," or any abbreviations or confusingly

similar variations thereof, unless that person is a business entity wherein an architect is: (1) in management control of the professional services that are offered and provided by the business entity; and, (2) either the owner, a part-owner, an officer or an employee of the business entity." Cal. Code Regs. tit. 16, § 134

28. Upon information and belief, Ramirez specifically described herself as an "architect" with the purpose and intent of deceiving Cassaforte to believe that she was qualified to render her professional opinion as to the feasibility of her design plans for the property.

29. On or about March 29, 2018, Debtor, through her company Studio Jhoiey, contracted with Johnson and/or XYZ Group to provide "Architectural & Design" services for the improvement of the Project (the "Architecture and Design Agreement").

**Debtor Falsely Represented the She Could Maximize the Property's Square Footage**

30. Given that Cassaforte was wholly unfamiliar with Los Angeles building and construction, it required a skilled architect's professional opinion to assess the Property's potential.

31. Accordingly, even before Cassaforte made its loan to the Project, it requested Ramirez's professional opinion so that it could satisfactorily assess the Property's profitability.

32. Cassaforte asked Ramirez several questions regarding the Property, and Ramirez supplied information without reservation. Indeed, Ramirez was acutely aware that Cassaforte was relying upon her professional experience, skill, and knowledge, as well as her representation that she was an "architect."

33. Ramirez repeatedly asserted that the Property was "a deal" and that a four-story residence could be built.

34. Cassaforte was particularly interested in the Property's available square footage; the approximate time it would take to obtain building and other necessary permits; and, relatedly,

whether this particular lot possessed any inherent complications that it should be aware of prior to financing the purchase.

35. Debtor and her company were eager to be engaged, and they displayed confidence that they could handle a project of such size and scope. Debtor represented herself and her company to Cassaforte as experts in the architecture and design industry in Southern California. Defendants touted their 20-plus years of experience and their "strong relationships between clients, manufacturers, developers, and builders that … are the crux of this industry." Ramirez also showed Cassaforte what she represented were prior and current projects.

36. Debtor described at length how she possessed "contacts" within the City of Los Angeles Department of Building and Safety (the "LADBS"), and how this special skill would expedite the permitting process. Indeed, Ramirez included a "Permit and Construction Document Set" and an "Expediting Service" in the Architectural and Design Services Agreement.

37. Despite these representations, Defendants did not possess the requisite licenses to provide these services.

38. Even more egregious was Ramirez's repeated representations that she had an ingenious "strategy" to increase the livable/sellable square feet of the Property. Specifically, Ramirez represented to Cassaforte that she could design a four-story residence-as opposed to a routine three-story residence-that would increase the gross leasable area (OLA) by approximately two thousand (2,000) square feet.

39. Naturally, Cassaforte was intrigued by Ramirez's "strategy." A larger square footage would yield a greater return on Cassaforte's investment. Had it not been for Ramirez's specific, detailed, and definite assertions that she could maximize the return on the Project-by designing a four-story home with over 1,000 extra residential floor area-Cassaforte would have

8

avoided purchasing the Property from the outset: there were simply too many reasons why it should exercise caution and stick to its more familiar territory of New York City.

40. Likewise, Cassaforte did not just blindly accept Ramirez's proposal. Cassaforte questioned Ramirez about her "strategy," and its underlying assumptions, on many occasions. The response was always the same: She was uniquely capable of designing a house that would exceed the approximately 3,500 square feet available by code by nearly "2000 plus of sellable floor area above code, plus around 2500 square feet of deck area."

41. Notwithstanding, Ramirez's design was later discovered to be critically flawed. Her fanciful design would never pass the strict controls of the LADBS because the design was "overbuilt," that is, although Ramirez had (purportedly) designed other buildings in the past, it is plain that she had no reasonable ground for believing that her unique "strategy" in this instance would pay off as planned.

42. Among the many errors in Defendants' strategy was that it improperly attempted to exclude the basement from the calculation of residential floor area in its proposed design.

43. This too was completely unknown to Cassaforte: It was decidedly and reasonably relying upon Ramirez's many, detailed and definite declarations that her skill in design would dramatically increase the company's profit margin. Had Cassaforte known Ramirez's declarations to be false, it would never have proceeded with the Project in the first place.

## COUNT I

**Non-Dischargeable Debt For Money Obtained by False Pretenses,
False Representations or Actual Fraud**

44. Cassaforte repeats and realleges the allegations as set forth in ¶¶ 1 through 43, as though fully set forth herein at length.

45. Debtor made numerous false representations to Cassaforte including holding herself out as an "architect" in violation of California Law.

46. Additionally, Debtor falsely represented her experience and ability with respect to the Property, including but not limited to the viability of constructing a four-story single-family residence on the Property site that would be approved by LADBS.

47. At the time these representations were made to Cassaforte, Debtor knew them to be false.

48. Cassaforte relied on Debtor's false representations when it engaged Debtor as the Architect on the Property, and funded the development of the project, through the Doheny Owner Company.

49. As a direct and proximate result of Debtor's false representations, Cassaforte suffered actual harm, as more fully set forth in the State Court Action.

50. Consequently, the subsequent debt owed to Cassaforte by way of the allegations in the State Court Action is one for money, property, or services obtained by false pretenses, false representations, or actual fraud, and is excepted from discharge pursuant to 11 U.S.C. § 523(a)(2)(A).

**WHEREFORE**, Cassaforte respectfully requests that the Court:

(i) Determine that the debt owed to Plaintiff as a result of the State Court Action, pending final adjudication of same on the merits, is non-dischargeable pursuant to 11 U.S.C. § 523(a)(2)(A);

(ii) Enter judgment against the Debtor in the amount of the State Court Action upon liquidation of the claim; and

  (iii)  Grant Cassaforte such other and further relief as the Court deems equitable and just.

Dated: February 8, 2022        Respectfully submitted,

                /s/ Leonard S. Spinelli
               Leoanrd S. Spinelli, Esq.
               **GENOVA BURNS, LLC**
               494 Broad Street
               Newark, NJ 07102
               Ph: (973) 230-2085
               Fax: (533-1112
               lspinelli@genovaburns.com