# <u>Exhibit A</u>

Electronically FILED by Superior Court of California, County of Los Angeles on 03/06/2020 11:34 AM Sherri R. Carter, Executive Officer/Clerk of Court, by D. Williams,Deputy Clerk

Case 2:22-ap-01041-NB    Doc 1-1    Filed 02/08/22    Entered 02/08/22 15:53:15    Desc
Exhibit A    Page 2 of 37

Assigned for all purposes to: Stanley Mosk Courthouse, Judicial Officer: Michael Stern

1  CHASSMAN & SEELIG LLP
   Mark B. Chassman (SBN: 119619)
2  mchassman@chassmanseelig.com
3  11766 Wilshire Blvd., Suite 270
   Los Angeles, CA 90025
4  Telephone: (310) 929-7192
   Facsimile: (310) 929-7627
5
   MEISTER SEELIG & FEIN LLP
6  Sara J. Triplett (SBN: 260122)
7  sjt@msf-law.com
   125 Park Avenue, 7th Floor
8  New York, NY 10017
   Telephone: (212) 655-6500
9  Facsimile: (212) 655-3535

10 Attorneys for Plaintiff

11              SUPERIOR COURT OF THE STATE OF CALIFORNIA

12              COUNTY OF LOS ANGELES, CENTRAL DISTRICT

13 CASSAFORTE LIMITED,                    Case No. 20STCV09319

14             Plaintiff,                 COMPLAINT FOR:

15      v.                                (1)  NEGLIGENT
                                               MISREPRESENTATION
16 JHONALYN JHOIEY RAMIREZ, and
17 STUDIO JHOIEY, INC                     (2)  NEGLIGENCE

18             Defendants.                (3)  MONEY HAD AND RECEIVED

19

20      Plaintiff Cassaforte Limited ("Cassaforte"), in its Complaint against Defendants Jhonalyn

21 Jhoiey Ramirez ("Ramirez") and Studio Jhoiey, Inc. ("Studio," and together with Ramirez,

22 "Defendants"), alleges as follows:

23                    **SUMMARY OF THE COMPLAINT**

24      1.      This action arises from Defendants' agreement to design and develop a single-family

25 home located in Hollywood Hills, for the benefit of the property's real estate owners and investors, *viz.*,

26 Cassaforte. The action seeks $848,000 in damages for negligent misrepresentation and negligence, and

27 at least $100,000 for money had and received.

28

                              – 1 –

2.        Specifically, Cassaforte, a mezzanine lender experienced in renovating and reselling properties in New York City, received an opportunity to invest in an expensive hillside lot in the Hollywood Hills area of Los Angeles. Completely unfamiliar with the area, Cassaforte was subsequently introduced to Defendants—professed Southern California architectural and design experts.

3.        Defendants represented that they could fashion a four-story residence that would increase the available square footage substantially, and thus confer Cassaforte with a significant return on its investment. Defendants also represented that the property possessed no inherent complications which would potentially threaten the deal or seriously delay the project. As such, Cassaforte relied on Defendants' representations in making its determination to lend to the Project.  It also approved engaging Defendants as the lead designer/architect for the Project.

4.        Defendants' representations, however, were disastrous for Cassaforte. Most egregiously, Defendants' Preliminary Floor Plan was so incompetently designed that it was approximately thirty percent larger than the applicable City zoning laws would allow. This meant that the completed Project would not be able to be built, marketed, and sold. The result was that Cassaforte was duped into lending into a Project that could never be built or generate the financial returns it expected. Had Cassaforte known that Defendants' plans could never come to fruition, it would never have loaned into the Project.

5.        In addition, what little Defendants did provide was significantly delayed *and* defective. Defendants produced little to nothing of value under their contract—certainly nothing constituting what they had agreed and represented they would do: such as, providing a comprehensive design package delineating all interior and exterior design; providing a valid permit and construction document set; providing engineering services; and providing "expediting services," which included working closely with the City of Los Angeles' Department of Building and Safety's Plan Checker.

6.        Defendants consequently left Cassaforte with an already-unsuccessful investment, and with no workable product, no design package or design development, and no valid permits. Yet Defendants received over $100,000.00 in "fees" ultimately paid by Cassaforte.

///

PLAINTIFF'S COMPLAINT

7.     As such, based on Defendants' false assertions and general incompetence, as well as their withholding of money that belonged to Cassaforte and was decidedly unearned, Cassaforte asserts claims of negligent misrepresentation, negligence, and money had and received.

**THE PARTIES**

8.     Plaintiff Cassaforte Limited ("Cassaforte") is a Cypriot limited company organized and existing under the laws of the Republic of Cyprus, with its principal place of business located at 1st Floor, Eurosure Tower, 5 Limassol Avenue, 2212 Nicosia, Republic of Cyprus. Cassaforte is a mezzanine lender specializing in real estate investments that involve the significant rehabilitation of single-family residences in New York City and Los Angeles.

9.     Defendant Jhonalyn Jhoiey Ramirez ("Ramirez") is, and at all times herein mentioned was, an individual and a citizen of the State of California. Ramirez conducts business in the County of Los Angeles. Ramirez holds herself out as "a designer and visual artist specializing in interiors and architecture." She also expressly claims that her "background in architecture has been a monumental service to both her and her clients—holding a BS in Architecture and a Masters in Interior Architecture has allowed great versatility and skill as the industry of interior design and architecture are inherently intertwined." But, Ramirez is not a licensed California architect.

10.     Defendant Studio Jhoiey, Inc. ("Studio") is, and at all times herein mentioned was, a corporation formed on December 19, 2011 under the laws of the State of California, with its principal place of business located at 7111 Santa Monica Boulevard #233, West Hollywood, California 90046. Ramirez is the Owner, Director, Chief Executive Officer, and President of Studio. Upon information and belief, Studio does not employ any licensed California architects and none of its principals are licensed California architects.

**JURISDICTION AND VENUE**

11.     This Court has subject matter jurisdiction over this action pursuant to California Constitution Article VI, section 10, and personal jurisdiction over the Defendants in accordance with California Code of Civil Procedure section 410.10 on the grounds that a substantial portion of the actions and events giving rise to this Complaint occurred in Los Angeles, California.

– 3 –

12.     Venue is proper in this district under Code of Civil Procedure sections 395(a) and 395.5 on the grounds that one or more of the Defendants reside in the County of Los Angeles. In addition, the obligations, breaches and liability of the Defendants arose in the County of Los Angeles.

## STATEMENT OF FACTS AND CLAIMS

**Cassaforte's Relationship to the Project – In General**

13.     On or about July 2017, Aaron Johnson ("Johnson") and his wholly-owned entity XYZ Group LLC ("XYZ Group") approached Cassaforte with a proposal to participate in several property acquisitions and development projects by providing loans to special purpose entities to be established by XYZ Group for the purposes of funding each development project. The debt was to be secured by a mortgage over the subject property of each project. Thereafter, it was decided that these projects would include the acquisition, development, and sale of the real property located at 1523 3/8 North Doheny Drive, Los Angeles, California 90069 (the "Property").

14.     Several potential lenders ("Senior Lenders") to these development projects declined to participate in the projects by way of this proposed structure because: (i) they would not agree to a fee-owning entity granting any security over the subject properties to any other party, whether such security was subordinated to the Senior Lender's security or not; and (ii) Cassaforte's status as a foreign lender would result in lengthy and expensive due diligence requirements for Senior Lenders, which they were not willing to undertake.

15.     XYZ Group subsequently requested, and Cassaforte agreed, that the proposed structure be replaced with a new structure ("New Structure") whereby XYZ Group would establish special purpose entities, *i.e.*, XYZ Holdings LLC and XYZ Holdings LA LLC, to hold all of the membership interests in the fee-owning companies and two other special purpose entities, *i.e.*, XYZ Partners and XYZ Partners LA, to hold 90% of the membership interests in XYZ Holdings and XYZ Holdings LA respectively.

/ / /

/ / /

– 4 –

16.     Under the mezzanine loan agreements, Cassaforte agreed to advance loans to XYZ Partners to fund the purchase of membership interests in XYZ Holdings which, in turn, would fund XYZ Holdings' purchase of membership interests in the fee-owning companies. In exchange, and in order to secure the punctual performance of XYZ Partners and XYZ Holdings' obligations under the various loan agreements, Cassaforte was granted a security interest in all of the membership interests in XYZ Partners and XYZ Holdings, and over all of the membership interests held by Johnson in XYZ Partners. An organizational chart showing the New Structure is attached as Exhibit 1.

17.     Between July 2017 and March 2018, Cassaforte and XYZ Group entered four transactions in which Cassaforte funded the development of four New York City properties pursuant to this structure. Cassaforte and XYZ Group similarly adhered to this New Structure when they created the transaction documents that pertain to the Property. Accordingly, XYZ Partners LA LLC, XYZ Holdings LA LLC, and the fee-owning company of the real property, 1523 Doheny, LLC, ("Doheny Owner Company") were formed on or about June 2018. *See* Exhibit 1.

18.     Doheny Owner Company is a single purpose limited liability company that owns fee title to the Property. (Doheny Owner Company's efforts to acquire, develop, and sell real property will be referred to as the "Project.") Doheny Owner Company is governed by transaction documents that include Loan Agreements and Operating Agreements. These transaction documents are substantively identical to those that Johnson and Cassaforte had employed for other, earlier real estate development projects.

19.     Johnson, through XYZ Group, was to act as Operating Manager and, *inter alia*, manage and control the day-to-day business and affairs of the Doheny Owner Company, and conduct all Owner business in accordance with the first-class standard of care required of prudent and experienced third-party managers, and in accordance with Doheny Owner Company's Project Budget and Project Business Plan.

20.     The Property was purchased for approximately $2.26 million in or around June 2018 using the pooled investment funds from Cassaforte and XYZ Group, as well as a commercial loan from a lender (the "Lender") secured by a Deed of Trust. XYZ Group contributed approximately $50,000 toward the acquisition. To date, Cassaforte has contributed approximately $848,000 to the Project.

– 5 –

21.     Thus, although Johnson exercised a managerial position over Doheny Owner Company, Cassaforte provided all the funds for the Project, outside of those provided by the lender. Cassaforte also made sure that it possessed substantial approval rights over the Project—as detailed in the transaction documents—as a means of ensuring its investment was protected.

22.     Cassaforte supplied XYZ Group with the necessary Project funds through various means—via bank wire or otherwise—and these funds were deposited in Doheny Owner Company's account. These funds were earmarked for developing the Project.

**Cassaforte Is Introduced to Defendants**

23.     In or about March 2018, during the time that Cassaforte was contemplating financing the purchase of the Property, Johnson introduced Ramirez to Cassaforte. Upon information and belief, Ramirez knew that Cassaforte was contemplating making a mezzanine loan to the Project and that without a mezzanine loan, the Project with her as architect would not proceed. An agent of Cassaforte, Joshua Lewski ("Lewski"), not only corresponded with Ramirez but also personally met with her in Los Angeles prior to agreeing to her engagement as the Project architect.

24.     Indeed, Cassaforte insisted upon vetting any architect or other professional before they could be engaged on the Project. This is because, as detailed above, XYZ Group acted only as the operating manager for the Doheny Owner Company. XYZ Group's responsibilities included managing the day-to-day issues of the Project, and dealing with the design, construction and other professionals, but it was not allowed to proceed with any Major Decision, including the hiring of professionals, without the express consent and approval of Cassaforte.

25.     Ramirez represented she was an experienced local architect, and that she and Studio were interested in—and capable of—designing and developing the Property. Ramirez represented herself as an expert in design and architecture and Ramirez took Lewski to several properties which she represented as her projects, both completed and works in progress, to demonstrate her competency and capability.

PLAINTIFF'S COMPLAINT

26.     Lewski therefore asked Ramirez for her professional opinion on several due diligence issues regarding the Property so as to determine whether it would be a good investment, and Ramirez confidently answered each, ensuring Lewski (and Cassaforte) that based upon her understanding, a four-story residence could be built; the permitting process would take approximately three months; the Property was a "deal," and she and her company were skilled professionals worthy of employment.

27.     Based, and in reasonable reliance, upon Defendants' representations, Cassaforte made the decision to finance the Project. Cassaforte also approved hiring Defendants as the architect and designer for the Project—chiefly because it was they who asserted that their inventive design would make the Project especially profitable. Ramirez and Studio were therefore officially engaged by XYZ Group.

**March 29, 2018 Architecture and Interior Design Services Agreement**

28.     On or about March 29, 2018, Defendants contracted with Johnson and/or XYZ Group to provide "Architectural & Design" services for the improvement of the Project (the "Architecture and Design Agreement"). A true and correct copy of the Architecture and Design Agreement is attached as Exhibit 2.

29.     Specifically, Defendants promised to provide a host of services for a flat rate of $100,000.00. The scope of work included interior and exterior design development; a permit and construction document set; engineering fees (*e.g.*, slope band analysis; structural engineering; and civil engineering); and an expediting service. (*Id.* at § 1.) Additional services, such as permit fees, project management, and staging were available at an hourly fee, or "at a fixed fee on an as needed basis/requested by Owner." (*Id.* at § 2.)

30.     The Architecture and Design Agreement provided in material part:

a.     The Project covered "One (1) Single Family Residence with a projected 4,000 SF to be designed fully inside, outside, façade along with exterior spaces" (*id* at § 1);

b.     The Scope of Work comprised "Design Package and Design Development," and this included (*id.*):

- Site measure and produce as-builts

– 7 –

- Site Plan Studies to explore using all the terraced outdoor area

- Floor Plan Studies for 3 beds & 3.5 baths within 3,700SF (per maximum Slope Band Analysis allow) but 4,000 SF that can be assessed after

- Design Package (Fixture, Finishes & Equipment Specifications), as follows…

- Design of Kitchen & Bath with details and specifications,

- Up to 2 schemes of Visual representation (3d Rendering) of 3 areas/rooms of the residence (*e.g.* Exterior/Open Living/Dining/Kitchen and Bathrooms)

- Specifications of Finish Material for Floors, Walls &Ceiling, based on 3d renderings (finished materials used on renderings will be selected during one of the meetings as mentioned below) Owner can select 2 different choices of finishes to see how it affects rendering,

- Specifications of window style and finish,

- Specifications of all lighting fixtures (general, ambient & specialty),

- Specifications of all plumbing fixtures (sinks, faucets, showers, etc. for both Kitchen & Bathrooms)

- Details & Finish specifications of Cabinetry (for Kitchen & Bath),

- Hardscape & Landscape Plan or Planting Schedule (maximum 2 schemes) (does not include Irrigation Plan or calculation)

- Façade Design (Finish Materials)

- Project Coordination with Architect/Consultants/Engineers as necessary

c.   A Permit and Construction Set that incorporated (*id* at § 1):

- Project Coordination with Engineers

- Architecture Construction Documents (Permit & Bid Set)

- Title 24 (Permit Set)

- Revisions required by the Building Department except if revisions were prompted by Design changes requested by Client after all Approvals

d.   "Engineering Fees" which included (*id.*):

- Slope Band Analysis

– 8 –

- Structural Engineering

- Civil Engineering

- Mechanical Engineering if needed or required by city

- Electrical Engineering if needed or required by city

- Landscape Architecture if needed or required by city

e. An "Expediting Service" that constituted (*id.*):

- Going to City to seat [sic] with Plan Checker, etc.

- EXCEPT Permit fees

f. A separate Joint Venture Agreement with a sliding scale pay-out will cover the Project management fees and Design Mark-up on all Building Materials Purchased by the Studio (*id.* at § 2);

g. A "Billing Schedule" requiring a $20,000.00 retainer, payable upon the signing of the contract for the Project. An invoice will be sent after each completion of the above stated Fixed Fee items for the remaining balance which is itemized on a General Invoice sent after this is signed (*id.* at § 4); and

h. A Dispute Resolution clause mandating the parties to the contract agree to endeavor first to settle the dispute in good faith by mediation for a period of thirty (30) days before resorting to binding arbitration (*id.* at Art. 6.03).

31.    Although the Architecture and Design Agreement was entered into on March 29, 2018—nearly two years ago—to date Defendants have failed to proffer Cassaforte any design package; produce any as-builts; or provide any interior or exterior specifications for a residence. Defendants have also failed to obtain any permits for the Property beyond a grading and pool demolition permits.

32.    Defendant provided only a Preliminary Floor Plan. Indeed, it was based upon this Preliminary Floor Plan that Cassaforte decided to invest in the Project. Yet this Floor Plan was later revealed to be critically defective. Defendants therefore only succeeded in incompetently designing a building that was thirty percent (30%) larger than the applicable law allowed.

– 9 –

33.     Despite agreeing to provide all these services, Studio did not employ any licensed California architects or engineers and none of the principals held such licenses. This was critical as applicable law requires that the four-story floor plan Studio ultimately prepared could only be designed by a licensed California architect.

34.     Thus, Defendants have provided absolutely nothing of value to Cassaforte or Doheny Owner Company—certainly nothing justifying $100,000.00 in fees. All that Defendants really provided Cassaforte was an incomplete, flimsy, and critically defective design. Moreover, were it not for Defendants' promise of an "inventive" floor plan, Cassaforte would never have financed the Project.

**May 15, 2018 Joint Venture Agreement**

35.     XYZ Group and Studio also entered into a letter of engagement for a joint venture on or about May 15, 2018 (the "Joint Venture Agreement"). A true and correct copy of the Joint Venture Agreement is attached as Exhibit 3.

36.     Under the Joint Venture Agreement, XYZ Group and Studio agreed that upon the sale of the Property, "Studio Jhoiey will receive a flat percentage of 20% on net profit," plus a bonus. (*See id.* at p. 2.) Cassaforte was not a party to this Joint Venture Agreement, but it was aware of this "back-end" deal between XYZ Group and Defendants. XYZ Group informed Cassaforte on or about May 16, 2018, that Ramirez would receive "a share of [XYZ Group's] profits at the end of the sale, as a form of compensation to incentivize her to design, build, and promote the successful sale of the project." Cassaforte has no objection to XYZ Group sharing *its* profits (if any) with Defendants but does object to sharing *the Project's* profits with Defendants.

**Defendants' Misrepresentations Concerning the Project**

37.     Given that Cassaforte was wholly unfamiliar with Los Angeles building and construction, it required a skilled architect's professional opinion to assess the Property's potential. Accordingly, even before Cassaforte made its loan to the Project, it requested Ramirez's professional opinion so that it could satisfactorily assess the Property's profitability.

38.    Cassaforte asked Ramirez several questions regarding the Property, and Ramirez supplied information without reservation. Indeed, Ramirez was acutely aware that Cassaforte was relying upon her professional experience, skill, and knowledge. Ramirez repeatedly asserted that the Property was "a deal" and that a four-story residence could be built. A true and correct copy of an email string last dated March 26, 2018 between Cassaforte and Defendants is attached as Exhibit 4.

39.    Cassaforte was particularly interested in the Property's available square footage; the approximate time it would take to obtain building and other necessary permits; and, relatedly, whether this particular lot possessed any inherent complications that it should be aware of prior to financing the purchase. *See, e.g.*, Exhibit 4.

## A.    Complexity and Difficulty of Obtaining Permits

40.    As detailed, the Property was unlike any of Cassaforte's other, earlier real estate investments. First, it is in Los Angeles, and Cassaforte's previous investments have all been in New York. The Property therefore was subject to a whole host of new and unfamiliar laws, regulations and permits.

41.    Second, the dilapidated residence on the Property required razing. Cassaforte therefore would not be rehabilitating or renovating a residence as was its custom; it would be constructing an entirely new house *from scratch*. Thus, a skilled architect who could competently design a luxury estate would be vital to the Project's success.

42.    Third, the Property is located in the very exclusive—and expensive—Hollywood Hills. This causes the Property to be not only very costly, but also subject to additional, special concerns related to the precariousness of construction in a special zoning district in Hollywood Hills.

43.    Fourth, the lot was accessible only by a "narrow" easement which needed to be large enough to accommodate fire and life safety equipment.

44.    Consequently, Cassaforte needed to be extra-cautious and exercise utmost due diligence in its acquisition of the Property. Cassaforte would have to rely on local experts to assess any latent complexities or hidden exposure prior to its determination to finance the Project.

– 11 –

45.    Defendants were eager to be engaged, and they displayed confidence that they could handle a project of such size and scope. Defendants represented themselves to Cassaforte as experts in the architecture and design industry in Southern California. Defendants touted their 20-plus years of experience and their "strong relationships between clients, manufacturers, developers, and builders— that…are the crux of this industry." Defendants also showed Cassaforte what they represented were prior and current projects.

46.    Defendants described at length how they possessed "contacts" within the City of Los Angeles Department of Building and Safety (the "LADBS"), and how this special skill would expedite the permitting process. Indeed, Defendants included a "Permit and Construction Document Set" and an "Expediting Service" in their Architectural and Design Services Agreement. *See* Exhibit 2 at § 1. Despite these representations, Defendants did not possess the requisite licenses to provide these services.

47.    Cassaforte, however, reasonably and justifiably relied on Defendants' representations regarding the Property. Cassaforte specifically asked Ramirez in March 2018 whether the Property possessed any inherent complications. Ramirez assured Cassaforte that she saw no complications in the Property, *i.e.*, "no complications outside what's normally encounter [sic] on [the] hillside." *See* Exhibit 4.

48.    Approximately eight months later, Defendants suddenly represented to Cassaforte that the Project was indeed "complicated." Defendants explained how there was an issue regarding the retaining walls of the Property's previous structure, and they also suggested to Cassaforte that there were issues surrounding earlier soil fills on the site "that were not permitted." These complications would necessarily delay any permitting of the Project.

49.    Accordingly, Defendants' March 2018 representations that the Property was without complication, and that Defendants were skilled in working with the LADBS and obtaining permits on an expedited basis, were patently untrue. The Project is still without a Permit and Construction Set to this very day. Had Cassaforte known that Defendants were supplying false information—upon which they had no reasonable grounds to believe to be true, despite whether they honestly believed them to be true—Cassaforte would never have approved Defendants' hiring for the Project.

– 12 –

### B.   Maximum Allowable Square Footage

50.   Even more egregious was Ramirez's repeated representations that she had an ingenious "strategy" to increase the livable/sellable square feet of the Property. Specifically, Ramirez represented to Cassaforte that she could design a four-story residence—as opposed to a routine three-story residence—that would increase the gross leasable area (GLA) by approximately two thousand (2,000) square feet.

51.   Naturally, Cassaforte was intrigued by Ramirez's "strategy." A larger square footage would yield a greater return on Cassaforte's investment. Had it not been for Ramirez's specific, detailed, and definite assertions that she could maximize the return on the Project—by designing a four-story home with over 1,000 extra residential floor area—Cassaforte would have avoided purchasing the Property from the outset: there were simply too many reasons why it should exercise caution and stick to its more familiar territory of New York City.

52.   Likewise, Cassaforte did not just blindly accept Ramirez's proposal. Cassaforte questioned Ramirez about her "strategy," and its underlying assumptions, on many occasions. The response was always the same: She was uniquely capable of designing a house that would exceed the approximately 3,500 square feet available by code by nearly "2000 plus of sellable floor area above code, plus around 2500 square feet of deck area." A true and correct copy of an email dated May 31, 2018 from Ramirez to Lewski is attached as Exhibit 5.

53.   Notwithstanding, Ramirez's design was later discovered to be critically flawed. Her fanciful design would never pass the strict controls of the LADBS because the Defendants' design was "overbuilt," that is, although Ramirez had (purportedly) designed other buildings in the past, it is plain that she had no reasonable ground for believing that her unique "strategy" in this instance would pay off as planned. Among the many errors in Defendants' strategy was that it improperly attempted to exclude the basement from the calculation of residential floor area in its proposed design.

54.   This too was completely unknown to Cassaforte: It was decidedly and reasonably relying upon Ramirez's many, detailed and definite declarations that her skill in design would dramatically increase the company's profit margin. Had Cassaforte known Ramirez's declarations to be false, it would never have proceeded with the Project in the first place.

– 13 –

## FIRST CAUSE OF ACTION

### (Negligent Misrepresentation Against All Defendants)

55.     Plaintiff incorporates the allegations contained in paragraphs 1 through 54.

56.     Defendants represented to Plaintiff, prior to its finance of the Property, that they were architectural and design experts capable of designing a four-story luxury residence that would increase the gross leasable area (GLA) of the Property by approximately two thousand (2,000) square feet, thereby maximizing any investment return. Defendants' assertions here were specific, detailed, and definite. Defendants, specializing in Southern California, proclaimed the Property to be "a deal."

57.     Defendants further represented to Plaintiff that they would perform and complete the Architectural and Design Services Agreement with the standard of care, skill and diligence followed by others in the industry, in the same location and time, and under the same circumstances.

58.     Defendants represented, among other things, that they would:

    a.    successfully design a four-story luxury residence that would be approved by the Los Angeles Department of Building and Safety;

    b.    that this four-story design would include an additional 2,000 square feet, for a total gross leasable area of approximately 5,584 square feet;

    c.    that the Property was without any inherent complications to construction; and

    d.    that they would be able to expeditiously provide a complete Permit and Construction Document Set.

59.     Defendants, however, were without reasonable grounds or a reasonable basis for believing such representations to be true.

60.     Defendants made these representations, among others, with the intent to induce Cassaforte to invest in the Project, and with the intent to secure the Project architectural contract.

61.     Defendants made these representations, among others, with the intent to induce Cassaforte's reliance and Cassaforte did rely on Defendants' representations. Defendants understood that any issue in the profitability and design would foreseeably affect Cassaforte.

– 14 –

62.    Cassaforte reasonably and justifiably relied on Defendants' representations made to it personally, in correspondence, and also as expressed in the Architectural and Design Services Agreement.

63.    As a result of Defendants' negligent misrepresentations, Plaintiff has sustained damages in an amount to be proven at trial, but in any event not less than $948,000.

## SECOND CAUSE OF ACTION

### (Negligence Against All Defendants)

64.    Plaintiff incorporates the allegations in paragraphs 1 through 63.

65.    As architectural/design experts, Defendants possessed a duty to use the skill, prudence, diligence, and care that a reasonably careful architectural/design expert would have used in the same or a similar locality under similar circumstances.

66.    Defendants breached this standard of care by, among other things, failing to successfully design a four-story luxury residence that would be approved by the Los Angeles Department of Building and Safety; failing to accurately calculate the allowable gross leasable area; and failing to expeditiously provide a complete Permit and Construction Document Set.

67.    Defendants' breach of the standard of care was a substantial factor in causing Cassaforte damages.

68.    As a result of Defendants' negligence, Plaintiff has sustained damages in an amount to be proven at trial, but in any event not less than $948,000.

## THIRD CAUSE OF ACTION

### (Money Had and Received Against All Defendants)

69.    Plaintiff incorporates the allegations in paragraphs 1 through 68.

70.    Although Defendants entered into the Architectural and Design Services Agreement with XYZ Group only, Defendants were unmistakably cognizant that they did so only upon the express approval and the request for such services by Cassaforte.

– 15 –

71.     Defendants were also unequivocally aware that the satisfactory completion of this agreement was intended—in large part—for the benefit of third party Cassaforte.

72.     Despite Defendants' non-performance of most, if not all, of their obligations under the Architectural and Design Services Agreement, Doheny Owner Company paid Defendants over $100,000.00, and perhaps as much as $200,000.00 or more, in purported fees relating to the improvement of that entity.

73.     Cassaforte indirectly provided the funds for Doheny Owner Company that were used to pay Defendants for their incomplete and/or incompetent services. As such, Defendants have received money that belongs to Cassaforte, and that in equity and good conscience should be paid back to Cassaforte.

74.     Defendants are therefore indebted to the Plaintiff in an amount to be proven at trial, but in any event, not less than $100,000.00.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against Defendants, jointly and severally, as follows:

1. For compensatory damages in an amount to be determined at trial.

2. Prejudgment interest at the maximum legal rate.

3. Plaintiff's costs of suit.

4. And such other and further relief as the Court deems just and proper.

DATED: March 5, 2020                    CHASSMAN & SEELIG LLP

                                        By: _____
                                            Mark B. Chassman
                                            Attorneys for Plaintiff

– 16 –

PLAINTIFF'S COMPLAINT

# EXHIBIT 1



CASSAFORTE LOANS ORG CHART

#7655723v1<Active> - Cassaforte Org Chart
Active\9034\1\7655723.v1-6/5/19

**EXHIBIT 2**

1118 N. DETROIT STREET, WEST HOLLYWOOD, CALIFORNIA 90068  USA                    M.+1.310.985.4137

29 March 2018

**Aaron Johnson**
**One World Trade Center**
285 Fulton Street Ste. 8500
New York, New York 10007
M: 323.810.3045
abc@xyzgroup.com

<u>***Proposal for: 1523 3/8 North Doheny Drive, Los Angeles, CA 90069***</u>

Dear Aaron:

I present this agreement ("Agreement") to reflect our understanding of the terms upon which you ("Client") agree to hire Studio Jhoiey, Inc. ("Designer") for Architecture & Interior Design services as further set forth below.


<u>1. **Fixed Fee Scope of Architectural & Design Services**</u>

   <u>**Description and Price for Interior & Exterior Design Services**</u>
   Designer will provide Interior Design & Construction Documents Services for the above residential address. Project covers **One (1)** Single Family Residence with a projected **4,000 SF** to be designed fully inside, outside, facade along with exterior spaces. Fee is calculated at a flat rate of **$25.00/SF** totaling to **$100,000.00**.


Scope of Work:
**Design Package and Design Development**

   ▪ Site measure and produce as-builts
   ▪ Site Plan Studies to explore using all the terraced outdoor area
   ▪ Floor Plan Studies for 3 beds & 3.5 baths within 3,700 SF (per maximum Slope Band Analysis allow) but 4,000 SF that can be assessed after
   ▪ Design Package (Fixture, Finishes & Equipment Specifications), as follows…
   ▪ Design of Kitchen & Bath with details and specifications,
   ▪ Up to 2 schemes of Visual representation (3d Rendering) of 3 areas/rooms of the residence (e.g. Exterior/Open Living/Dining/Kitchen and Bathrooms)
   ▪ Specifications of Finish Material for Floors, Walls & Ceiling, based on 3d renderings (finished materials used on renderings will be selected during one of the meetings as mentioned below) Owner can select 2 different choices of finishes to see how it affects rendering,
   ▪ Specifications of window style and finish,
   ▪ Specifications of all lighting fixtures (general, ambient & specialty),

1118 N. DETROIT STREET, WEST HOLLYWOOD, CALIFORNIA 90068 USA                         M.+1.310.985.4137

- Specifications of all plumbing fixtures (sinks, faucets, showers, etc. for both Kitchen & Bathrooms),
- Details & Finish specifications of Cabinetry (for Kitchen & Bath),
- Hardscape & Landscape Plan or Planting Schedule (maximum 2 schemes) (does not include Irrigation Plan or calculation)
- Façade Design (Finish Materials)
- Project Coordination with Architect/Consultants/Engineers as necessary

**Permit and Construction Document Set**

- Project Coordination with Engineers,
- Architecture Construction Documents (Permit & Bid Set)
- Title 24 (Permit Set)
- Revisions required by Building Department except if revisions were prompted by Design changes requested by Client after all approvals

**Engineering Fees**

- Slope Band Analysis
- Structural Engineering
- Civil Engineering
- Mechanical Engineering if needed or required by city
- Electrical Engineering if needed or required by city
- Landscape Architecture if needed or required by city

**Expediting Service**

- Going to City to seat with Plan Checker, etc
- EXCEPT Permit fees

**<u>Fixed Fee Design Services Schedule</u>**

> Schedule starts after Contract approval and receipt of payment of the retainer fee. A weekly update with Action Items will be submitted every Friday starting March 30. Projected Schedule after Escrow closes 8 weeks before submitting for Plan Check, 1624 weeks in Plan Check including Plan Check appointments before Permit is issued, construction in 56-64 weeks of Construction Schedule.

**<u>2. Additional and/or Hourly Services: (the following services are billed hourly, per square feet or at a fixed fee on an as needed basis/requested by Owner)</u>**

1118 N. DETROIT STREET, WEST HOLLYWOOD, CALIFORNIA 90068  USA                          M.+1.310.985.4137

*A separate Joint Venture Agreement with a sliding scale pay-out will cover Project Management Fees and Design Mark-up on all Building Materials purchased by studio.*

**Projected Additional Expenses**

- Permit Fees
- Printing Fees
- Parking Fees
- Or general reimburseable
- Project Management
- Purchasing Finishes
- Staging

*Please note, that NO Additional Services will be performed or billed without prior request and approval of the Owner.

## 3. Compensation

- All hourly services requested beyond Scope Of Work will be billed hourly in accordance to Article 5.03 of the Standard Terms and Conditions.
- Additional services beyond the above stated Scope Of Work and any Owner revisions after Owner approvals will be billed in accordance to article 5.01 of the Standard Terms and Conditions.

## 4. Billing Schedule

A **Twenty Thousand Dollars ($20,000.00)** retainer is payable upon signing the contract for the project. An invoice will be sent after each completion of the above stated Fixed Fee items for the remaining balance which is itemized on a General Invoice sent after this is signed. Reimbursable expenses and Cost of Goods Purchased are payable in accordance to Article 5.05 of the Standard Terms and Conditions. The retainer will be applied on the last Invoice upon completion of work.

Any Additional Services requested will be billed upon each stage of completion. Please review Article 3.03 of the Standard Terms and Conditions for additional information.

## 5. Exclusions

- Printing fees
- Agency fees, modification, variance or specialized permit processing.

1118 N. DETROIT STREET, WEST HOLLYWOOD, CALIFORNIA 90068  USA                                    M.+1.310.985.4137

- Consultant services outside Scope of Work will be billed hourly in accordance to article 5.03 of the contract.
- Reimbursable expenses will be billed hourly in accordance to article 5.04 of the contract.

## 6. Acceptance Terms

- Please send a signed original of the contract and the initial payment of **$20,000.00 dollars** to our office prior to the commencement of work.  Retainer may be paid through QuickBooks or via wire transfer.
- The attached Standard Terms and Conditions are a part of this contract.
- This contract is subject to acceptance within ten working days.

Sincerely,

Date: 29 March 2018

**Jhoiey Ramirez**
1118 N. Detroit Street, West Hollywood CA 90046
310.985.4137
Jhoiey@StudioJhoiey.com

Acknowledgment and acceptance:

Date: May 15, 2018

**Aaron Johnson**
One World Trade Center
285 Fulton Street Ste. 8500
New York, New York 10007
M: 323.810.3045
abc@xyzgroup.com

STU
D O
_thing_

1118 N. DETROIT STREET, WEST HOLLYWOOD, CALIFORNIA 90068  USA                                        M.+1.310.985.4137

## STANDARD TERMS AND CONDITIONS

### Article 1. Responsibilities of DESIGNER

1.01    Designer will perform the Work with the standard of care, skill and diligence followed by others in the industry, in the same location and time under the same circumstances.

1.02    Communications Facilitation Contract Administration: Except as otherwise provided in the Contract Documents, Owner and Contractor must endeavor to communicate through Designer. Communications by and with Designer's consultants must be through Designer. Communications by and with subcontractors must be through the Contractor.

1.03    All change orders discussed in Article 4, additions, substitutions generated by Owner must be approved by Designer in writing prior to the commencement of work.

1.04    Designer must at all times have access to the Work wherever the Work is in preparation and progress.

1.05    Designer will visit the site at intervals appropriate to the stage of construction to familiarize itself generally with the progress and quality of the Work and to determine in general if the Work is proceeding in accordance with the Contract Documents; however, Designer will not be required to make exhaustive or continuous on-site inspections to check the quality or quantity of the Work. On the basis of on-site observations as Designer, Designer will keep Owner informed of the progress of the Work and will notify Owner of any known defects and deficiencies in the work of the Contractor. Designer will not have charge of, control over, nor be responsible for construction means, methods, techniques, or procedures nor for safety precautions and programs in connection with the Work, and will not be responsible for Contractor's failure to carry out the Work in accordance with the Contract Documents.

1.06    Designer will be the interpreter of the requirements of the Contract Documents and will make recommendations for cure on all claims, disputes or other matters in question between Owner and the Contractor; however, Designer will not be liable for the results of any interpretation or recommendations rendered in good faith.

1.07    DESIGNER will recommend Owner to reject work that does not conform to the Contract Documents. DESIGNER' decisions in matters relating to artistic effect will be final if consistent with the intent of the Contract Documents and approved by Owner.

### Article 2. Responsibilities of Owner

2.01    Owner must provide information regarding Owner's requirements for the Work, as well as legal descriptions and surveys of the site and all existing structures and conditions.

2.02    Owner must provide the services of a surveyor and the services of soils, geology, civil, structural, mechanical, electrical, landscape, and/or Title 24 consultants, as requested by governing agencies, or as required for the Work to proceed.

2.03    Designer must be entitled to rely on, and will not be liable for, the accuracy of information provided by Owner, Owner's consultants, and Owner's Contractor.

2.04    Owner must, at the request of Designer, provide a certified or notarized statement of funds available for the Work and the source of such funds.

1118 N. DETROIT STREET, WEST HOLLYWOOD, CALIFORNIA 90068  USA                    M.+1.310.985.4137

2.05    Owner agrees to give to Designer prompt written notice if Owner observes or otherwise becomes aware of a fault or defect in the Work or any nonconformity with the design or Construction Documents.

2.06    Owner agrees to respond promptly, and in no event after more than 48 hours, to Change Order requests that have been approved by Designer.

2.07    Owner agrees not to communicate with the Contractor or subcontractors in order to request changes, additions or revisions to the Work, or to determine the schedule, means and/or methods of construction.

2.08    Owner agrees to choose, approve and/or purchase all Owner-provided materials and fixtures to be available and on-site for installation by the Contractor in accordance with the schedule of construction provided by the Contractor.

2.09    Except as provided herein, Owner agrees not to contract with the Contractor or subcontractors for any work in addition to the Contract Documents for the period of time and scope of work covered by this Contract.

## Article 3. Relationship of DESIGNER and Owner

3.01    DESIGNER accepts the relationship of trust and confidence established by this Contract and covenants with Owner to cooperate with Owner, and to utilize Designer's best skills, efforts and judgment in furthering the interests of Owner, to furnish efficient business administration and supervision to perform the Work in the best, most expeditious and economical manner, consistent with the interests of Owner.

3.02    Owner agrees to exercise best efforts to enable Designer to perform the Work in the best way and most expeditious manner by furnishing and approving in a timely manner all requests approved and certified by Designer.

3.03    Recommendations by Designer of any contractors, subcontractors, consultants or other referrals are solely for the convenience of Owner and are not to be construed as a guarantee or warranty by Designer of the work or quality of such recommended parties. Designer will not be liable to Owner or any other party for any acts or omissions by Contractor, subcontractors, consultants or referrals or any other professionals or laborers employed by Owner or by Designer while acting as Owner's representative. Designer has no responsibility for delays that are caused by any person or event outside the sole control of Designer. Further, Designer will not be responsible if Owner, Contractor, subcontractors, consultants or referrals make changes to the Work without written notification and approval by Designer. Owner agrees that the limit of liability to Designer must be the amount of any fees actually collected by Designer.

## Article 4. Provisions

4.01    Instruments of Service: The Design and Contract Documents, including drawings, sketches, specifications, and computer files, are instruments of service, prepared for this project only. Owner must be permitted to retain copies for information and reference only, and such copies are not to be used on other projects nor by other persons for completion of or extensions to the Work without the written and signed consent of Designer. Designer retains Ownership of the drawings. Any copyright, trademark, trade secret, patentable subject matter or other intellectual property right which has

1118 N. DETROIT STREET, WEST HOLLYWOOD, CALIFORNIA 90068  USA                                    M.+1.310.985.4137

been or is hereafter created in connection with the Work, any Change Orders shall be the sole and exclusive property of Designer.

4.02    Upon the Owner's request and for the Owner's convenience, the Interior Designer will provide Instruments of Service in Electronic Format to the Owner or to vendors providing other necessary services for the Project for the use and maintenance of this Project only. Documents provided in electronic format are furnished without guarantee of compatibility with other software or hardware, and the Interior Designer's sole liability must be limited to replacement of defective files within 30 days after delivery to the Owner. In the event of a conflict in their content, printed hard copies must take preference over documents in electronic format. Because of the potential for alternation of the data stored in electronic format and for use of the Instruments of Service, the Owners agrees to indemnify, defend and hold harmless the Interior Designer, the Interior Designer's Consultant, and other officers and employees of any of them from and against any and all claims, liabilities, damages, losses and costs, including but not limited to reasonable attorney's fees and all legal expenses and fees incurred on appeal, and all interest thereon, accruing or resulting to any and all persons, firms or other legal entity, on account of any damage or loss of property or persons, including death arising from the alteration of modification in electronic format in the Owner's possession or released to others by the Owner and arising out of uses specifically prohibited herein.

4.03    Construction Cost: Designer will not be responsible for providing detailed cost estimates for any part of the Work, and due to market conditions, cannot warrant that the construction bids and Owner-provided material costs will not vary from any opinion, estimate or evaluation of construction cost provided by others.

4.04    Toxic substances: It is unknown whether the site contains toxic substances; therefore, Owner must indemnify DESIGNER from any action related to the potential or actual exposure of persons to toxic substances.

4.05    Site Visitation: Designer and its staff must have access to the Work wherever it is in preparation or progress and are permitted to photograph the Work during construction and upon completion for its records and future use. Owner's confidentiality will, at all times, be maintained, and no reference to Owner's name or address will be published without written permission of Owner.

4.06    Signage: Designer has the right to post job signs on site for the length of the construction process as necessary to identify DESIGNER as the Designer.

4.07    Owner will permit Designer to photograph the project during construction, and on completion of the Project. Designer will be entitled to use photographs for DESIGNER' business purposes but will not disclose the Project location OR Owner's names without prior written consent of the owner.

4.08    In all cases, Designer must be given full design credit for the project, and in any publication, this design credit must be published along with any photographs of the project.

4.09    Purchasing: Designer agrees to assist Owner in purchasing materials and fixtures as requested by Owner. Purchases will be presented to Owner by written proposal for Owner's approval and will be made only upon written approval by Owner.  DESIGNER agrees to pass on all designer discounts to Owner, but may also assess service fee, not to exceed thirty percent (30%). Owner is responsible for all sales taxes, freight charges and handling charges relating to each purchase. Material specifications work is integral to the communication of the design concept, and as such, a few hours of the fixed fee contract are included for these design services. Time spent shopping with you and selection and specification time in excess of these hours will be billed hourly in accordance with Article 5.03, which delineates our hourly fees. Please be advised that fees specifically involved in the sale of tangible personal property are subject to sales tax in the State of California and will be billed accordingly.

1118 N. DETROIT STREET, WEST HOLLYWOOD, CALIFORNIA 90068  USA                                    M.+1.310.985.4137

4.10    Designer does not warrant any purchases against manufacturer's defects or damages. Owner must notify Designer of any warranty claims and you will, at the very least, offer advice on how to proceed with a claim. All warranties exist between Owner and the manufacturer.

4.11    Purchases are not returnable or cancelable unless allowed by the vendor. If Owner needs to return or exchange an item, within 10 business days of purchase, DESIGNER will assist Owner with any returns to a manufacturer or vendor, subject to the return policies of the vendors and manufacturers. All restocking fees are the responsibility of Owner.

4.12    All fees and conditions of this agreement are subject to renegotiation if the design services are not completed within one year of the date of this agreement.

4.13    Change Orders:  As used herein, "Change Order" means the occurrence of: any change, amendment or modification to the Work to accommodate different design features, elements, upgrades or modifications not originally included in the Agreement or as proposed or required based on availability of materials, equipment or labor, including minor departures pursuant to field orders after the Agreement Date.  Designer from time to time may request a Change Order from Owner.  All Change Orders shall require the approval of Owner. For any Change Order requested by Owner, Designer may at its option charge to Contractor a Change Order review fee based on Principal Designer's hourly rate for each such request.  The Change Order review fee shall be payable by Owner to Designer within ten (10) days after receipt of invoice therefor and shall be owing by Owner regardless of whether such proposed Change Order is approved. Owner's obligation to pay to Designer any Change Order review fees assessed by Designer shall survive the expiration or earlier termination of this Agreement. Each approved Change Order shall specify the adjustment, if any, to the total price.

4.14    Code Compliance and Permitting:  Owner acknowledges that the contractor is solely responsible for causing the Agreement to satisfy or to incorporate any design or other requirements of any Local Codes and Zoning Requirements. Owner acknowledges that the contractor is solely responsible, at its expense, for obtaining all requisite building permits necessary for the Work.

**Article 5. Compensation**

5.01  Additional Services: Designer must provide additional services (those outside the Scope of Work set forth above) if requested or authorized by Owner in writing. Compensation for Additional Services, unless other arrangements are agreed upon prior to commencement of the Work, will be billed at our hourly rates as set out below:

5.03    Hourly Rates
Principal Designers: $300.00 per hour;
Project Manager: $200.00 per hour;
Technical/Drafting Staff: $150.00 per hour; and
Administrative Staff: $75.00

5.04    Reimbursable Expenses: Invoiced Monthly as Follows:
Mileage: $0.55/mi
In-house Plotting: $1.00 per square foot, e.g. 24 x 36 sheets equal $6.00 each;
Black/White Prints: $0.50 each – 8.5 x 11; 11 x 17; 12 x 18;
Color Prints: $1.00 each – 8.5 x 11; $2.00 each 11 x 17
Xerox and Xerox Color: 1.2 x cost;
Reproductions: Blueprints and large format copies – 1.2 x cost;

1118 N. DETROIT STREET, WEST HOLLYWOOD, CALIFORNIA 90068  USA                    M.+1.310.985.4137

Postage: 1.2 x cost; and
Agency, Consultant and Miscellaneous: 1.2 x cost.
5.05    Payment Terms:
Payments are due and payable upon receipt of invoices. Billing is considered approved as submitted if Owner does not notify DESIGNER otherwise within seven (7) business days. Amounts unpaid fifteen (15) days after date of invoice are cause for suspension of services with no liability to DESIGNER for delay or damage caused by such suspension. A late fee of two percent (2%) per month will be assessed on balances unpaid after thirty calendar days.

### Article 6. Termination and Dispute Resolution

6.01    Certification: Owner agrees not to make any claim against Designer without first providing DESIGNER with a written certification provided by an independent California Certified Interior Designer practicing in Southern California, specifying each and every act or omission which the certifier contends violates the standard of care followed by others in the industry providing services under the same circumstances. Certification must be provided no less than thirty (30) days prior to the presentation of any claim. This provision will survive termination of this Agreement.

6.02    Termination: This Contract may be terminated by either party upon seven (7) days written notice. In the event of termination by Owner, Owner is responsible for all fees for services performed and reimbursable expenses incurred up to and including the day of termination.

6.03    Dispute Resolution: If a dispute arises from or relates to this Agreement or the breach thereof, and if the dispute cannot be settled through direct discussions, the parties agree to endeavor first to settle the dispute in good faith by mediation for a period of thirty (30) days before resorting to binding arbitration. A party who intends to seek arbitration must first send, by U.S. certified mail, a written Notice of Dispute to the other party containing (a) the nature and basis of the claim or dispute and (b) set forth the specific relief sought.  A single, neutral and unbiased arbitrator, in accordance with American Arbitration Association and California and Federal laws, will determine arbitration. The judgment on the award rendered by the arbitrator may be entered in any court having jurisdiction thereof. The cost of the arbitration or mediation, excluding legal fees, shall be borne equally between the Designer and Owner.  This arbitration provision will survive termination of this Agreement.

6.04    Limitation of Liability: In the event of legal actions against Designer by Owner, DESIGNER is entitled to attorneys' fees and costs incurred if Designer is determined to be not at fault. Owner agrees to limit all liability, claims for damage, cost of defense, and/or expense for any legal action related to this Contract to a sum not to exceed the amount paid for services under this Contract. This provision will survive termination of this Agreement.

6.05    Agreement: Owner and Designer agree to bind themselves, their successors, and assigns to this Contract. Neither Owner nor Designer may assign, transfer or otherwise convey their interests in this Contract without prior written consent of the other. This Contract may be amended only by written instrument signed by both Owner and Designer. This agreement supersedes all prior representations, negotiations, or oral and written agreements. If any provision of this Agreement or the application thereof to any person or circumstance shall be held by a court of competent jurisdiction to be invalid or unenforceable to any extent, the remainder of this Agreement and the application of such provision to other persons or circumstances shall not be affected thereby and shall be enforced to the greatest extent permitted by law.

6.06    Force Majeure:  Neither party shall be deemed in breach of its obligations under this Agreement because of any delay or failure in the performance of such obligations (other than failure to pay money when due) to the extent such delay or failure is due to a Force Majeure Event. "Force Majeure

1118 N. DETROIT STREET, WEST HOLLYWOOD, CALIFORNIA 90069  USA                    M.+1.310.985.4137

Event" means circumstances beyond the reasonable control of the party experiencing such delay or failure, including, but not limited to, acts of God; unusually severe weather conditions; fire; storm, flood, earthquakes; explosion; epidemics; strikes or other labor difficulties; unavailability of materials, war; civil commotion; public disturbances; requirements, actions or failures to act on the part of federal, state or local governmental authorities; acts of the other party; accident; or damage to, loss of right to or destruction or breakdown of necessary facilities; provided that (i) the nonperforming party gives the other party notice as soon as practicable describing the particulars of the occurrence; (ii) the suspension of performance is of no greater scope and of no longer duration than is required by the Force Majeure Event; (iii) the nonperforming party uses commercially reasonable efforts to remedy its inability to perform (but Seller is not required to employ a different manufacturer of the Units); (iv) when the nonperforming party is able to resume performance of its obligations under this Agreement, that party shall give the other party written notice to that effect; and (v) the condition or event was not caused by the negligence or willful misconduct of the party seeking to be excused or by any breach or default of this Agreement by such party

### Article 7. Acceptance

By execution of this document, I agree to have read and fully understand all statements and implications of this document. I agree to explicitly abide by and follow the above conditions as listed in this agreement.

Acknowledgment and acceptance:

*Aaron Johnson*

_____                   Date: May 15, 2018

**Aaron Johnson**
One World Trade Center
285 Fulton Street Ste. 8500
New York, New York 10007
M: 323.810.3045
abc@xyzgroup.com

**EXHIBIT 3**



# Letter of Engagement

05.15.2018

An Agreement between:

## Aaron Johnson
XYZ Group LLC
One World Trade Center
Suite 8500
New York, NY 10007

## Jhoiey Ramirez
Studio Jhoiey, Inc
1118 N Detroit St
West Hollywood, CA 90046

## Overview

This is a letter of engagement for joint venture between XYZ Group (of New York, New York) and Studio Jhoiey (of West Hollywood, California) for the property located at 1523 ⅝ N Doheny Dr, Los Angeles, CA 90069 (referred to as 'the property'). Listed below are the overall goals of project, who is responsible for what, and lastly financial compensation.

## Project Goals

1. <u>Initial research</u> and logistics planning (XYZ Group)

2. <u>Acquisition</u> and financial budgeting (XYZ Group)

3. Property development in <u>20 Months</u> (Jhoiey Studios)

4. With a budget within <u>1.8 Million</u> (Jhoiey Studios)

5. Sell the property for <u>$8.3 Million</u> (Jason Oppenheim)

## Responsibilities

As listed the general outline of project responsibilities are listed in overall goals. To be more specific, <u>XYZ Group is for the Financial Funding</u> (ie Acquisition, Financing, Planning) and <u>Studio Jhoiey's duties and responsibilities for the predevelopment and development</u> of the property (ie Architecture, Design, and Project Management).

## Compensations

Studio Jhoiey will receive a <u>flat fee of $100,000</u> for the Design and Architecture of the property (refer to the separate letter 'scope of work'). Secondly, Studio Jhoiey will receive a flat percentage of <u>20% on net profit</u>. Plus a bonus, see attachment "payout."

Signed  *Aaron Johnson*
         Aaron Johnson
Dated     5/15/2018

Signed  *Jhoiey Ramirez*
         Jhoiey Ramirez
Dated     5/15/2018

**EXHIBIT 4**

**From:** Jhoiey Ramirez <jhoiey@studiojhoiey.com>
**Date:** 26 March 2018 at 10:38:15 pm GMT-4
**To:** Joshua Lewski <josh@firstrealfund.com>
**Cc:** "abc@xyzgroup.com" <abc@xyzgroup.com>
**Subject: RE: TITLE REPORT Order #111803658 - 1523 3/8 North Doheny Drive, Los Angeles, CA 90069**

Hi Josh!

Here's the massing model.  From here you could see the strategy we are taking in comparison to just
going 3 stories high.  You'll see that every roof space is an opportunity to become a deck.

 Jhoiey

 **From:** Joshua Lewski <josh@firstrealfund.com>
**Sent:** Monday, March 26, 2018 6:17 PM
**To:** Jhoiey Ramirez <jhoiey@studiojhoiey.com>
**Cc:** abc@xyzgroup.com
**Subject:** Re: TITLE REPORT Order #111803658 - 1523 3/8 North Doheny Drive, Los Angeles, CA 90069

I thought slope analysis was already underway ad part of our d/d. Preferably I want this done before we
move ahead ...I'm

Not sure why t wasn't done. How soon can it be for. And what is cost?


On 27 Mar 2018, at 11:11 am, Jhoiey Ramirez <jhoiey@studiojhoiey.com> wrote:

Josh,

 We should do the Slope Band Analysis as soon as possible because until I get that, we are guessing on
max square footage that will be reflected on the permit and I can't finalize the plans.  This is typical
hillside and I don't see any complications outside what's normally encounter on hillside.  Again, being on
bedrock is a plus which is rare to find.

 As far as I am concerned, you are getting a deal...  You can also market that this was the Osbourne's
home before.

 ***Jhoiey Ramirez***
Studio Jhoiey, Inc.
1118 N Detroit St. West Hollywood CA 90046
+1.310.985.4137
jhoiey@studiojhoiey.com
www.StudioJhoiey.com
http://studiojhoiey.houzz.com/

**EXHIBIT 5**

**From:** Josh Lewski <josh@apccapital.com.au>
**Sent:** Friday, November 1, 2019 12:19 PM
**To:** Howard S. Koh <hsk@msf-law.com>; Sara J. Triplett <sjt@msf-law.com>
**Subject:**

[External Email - Use Caution]

Begin forwarded message:

**From:** Jhoiey Ramirez <jhoiey@studiojhoiey.com>
**Date:** 31 May 2018 at 12:08:11 pm GMT-4
**To:** Joshua Lewski <josh@firstrealfund.com>
**Cc:** "abc@xyzgroup.com" <abc@xyzgroup.com>
**Subject: RE: Doheny**

Hi Josh!

This is the latest:

| | ACTUAL | NOT INCL IN SLOPE BAND | Total GLA | OUTDOOR DECKS | SLOPE BAND MAX |
|---|---|---|---|---|---|
| **TOTAL SQUARE FOOTAGE** | **3,585** | **1,999** | **5,584** | **2,444** | **3,588** |
| ENTRY HALLWAY | 200 | | | | |
| MASTER SUITE | 555 | 125 | | | |
| DECK FROM MASTER | | | | 883 | |
| GREAT ROOM | 1,700 | | | | |
| DECK FROM GREAT ROOM | | | | 1,275 | |
| HALLWAY | | 261 | | | |
| BEDROOM 2 | 500 | | | | |
| DECK FROM BEDROOM 2 | | | | 154 | |
| VOID/STORAGE (OFFICE) | | 153 | | | |
| MECHANICAL ROOM (STORAGE/UTILITY) | | 160 | | | |
| BEDROOM 3 | 430 | | | | |
| DECK FROM BEDROOM 3 | | | | 132 | |
| GARAGE | | 400 | | | |
| REAR ENTRY | 200 | | | | |
| SUBTERENEAN THEATER | | 900 | | | |

Target budget is $1.8M

*Jhoiey Ramirez*
Studio Jhoiey, Inc.
1118 N Detroit St, West Hollywood CA 90046
+1.310.985.4137
jhoiey@studiojhoiey.com
www.StudioJhoiey.com
http://studiojhoiey.houzz.com/